PROVOSTY, J.
Plaintiff sues in damages for the death of her husband, alleged to have resulted from the negligence of the defendant company. He was employed by the defendant company in its roundhouse at Eunice, La. I-Iis functions consisted in receiving the locomotives that came to the roundhouse, taking care of them, and having them filled with water and steamed up, ready for. use, when called for. While he was steaming up an oil-burning locomotive, the crown sheet (which is the piece, or part, directly above the fire, separating it from the water in the boiler) gave way, by reason of the downward pressure of the steam, and a sort of explosion resulted, by which the fire doors were lifted from their hinges and blown out, and made to strike him and another man, and kill them.
[1,2] A statute of this state gives a right of action to a widow for the death of her husband caused by the negligence of another person. This statute is superseded, however, by the federal Employers’ Liability Act (35 Stat. 65, c. 149 [U. S. Comp. St. Supp. 1909, p. 1171]), in all cases coming under the latter statute; and, under the latter statute, the widow has no right of action, but the suit for her benefit must be bought by" the personal representative of the decedent.
Nothing on the face of the petition in this case indicated under which one of these statutes the present ease came; and the defendant joined issue on the merits, and went to trial, without any request for an amendment of the petition in that regard, and without any exception to the right of the plaintiff to stand in judgment in the suit, but in this court has filed an exception of no right of action in the plaintiff, and, in support of that exception, contends that the locomotive in question was engaged in interstate commerce, and that, as a consequence, the decedent, while attending upon it, was, in like manner, engaged in interstate commerce, and that therefore the ease comes under the federal statute, and only the personal representative of the decedent could bring the suit.
Plaintiff objects that this exception comes too late; that it is one to the capacity of the plaintiff to stand in judgment; and that exceptions of that character are not permissible after issue joined.
We agree with defendant that a total absence of right on the part of the plaintiff may be urged at any stage of the cause. Brown v. Saul, 4 Mart. (N. S.) 434, 16 Am. Dec. 175; Montford v. Schmidt, 36 La. Ann. 750. And that, if the case does come under the federal statute, the plaintiff is totally without right of action in the premises. Pederson v. Delaware, L. & W. R. R. Co., 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1125; St. L. S. F. & T. R. R. Co. v. Seale, 229 U. S. 156, 33 Sup. Ct. 651, 57 L. Ed. 1129.
[3] But 'we do not agree with defendant that this case does come under the federal statute. For showing that it does, defendant relies exclusively upon the following testimony:
“Q. Where did this engine run? A. It worked all the way between Houston and New Orleans ; it ran out of De Quincy both ways.”
De Quincy is a Louisiana town. We do not understand this evidence to mean any more than that this locomotive, like any other locomotive of the defendant company, or any of its cars, might be and was sometimes used in interstate commerce. Not that it was being so used at the time the decedent was attending to it. On the contrary, the evidence sfiows that its last run, which was on the preceding day, had been from another intrastate point to Eunice. If the fact that a locomotive or a car might be used the next day, or whenever next needed, in interstate commerce, were equivalent to being actually at the time in use in that commerce, the effect would be that whenever a railroad did not confine itse’f to intrastate commerce, but engaged also m interstate commerce, every' *134 one of its employés would at all times be engaged in interstate commerce when at their work. The two decisions of the Supreme Court of the United States, supra, are relied upon by defendant’s learned counsel; but these decisions, as we understand them, are very far from having that broad scope. In one of them a clerk was injured while actually on his way to take the numbers of, and seal up and label, cars loaded with interstate freight. In the other an employe was killed while carrying a sack of bolts to be used in repairing a bridge which was regularly in use in interstate commerce. In those cases, although the connection was but slight, there was a direct engagement in interstate commerce, whereas a locomotive or an empty car, which has completed an intrastate run and may on its next run be used in like manner intrastate, cannot be* said to be actually engaged in interstate commerce. The most that can be said is that it has been so used, if such be the fact, and that it may ón its next run be so used.
[4] On the merits, the sole question is whether there was or not water over the crown sheet at the time of the explosion. If there was, then the explosion was the result of defective condition of the boiler, and the defendant company is responsible, on the principle that the employer must furnish the employé safe appliances to work with. If, on the other hand, there was no water over the crown sheet, the explosion was the result of the fault of plaintiff’s husband in starting the fire without first replenishing the boiler; and plaintiff cannot recover.
Plaintiff seeks to make capital out of the fact that the engine was not equipped with a fusible plug; but the evidence shows that this device is of questionable utility, and is not used by some railroads, and is being discarded by others.
The explosion occurred in the night of February 25, 1912, at 5 a. m. The engine had come into' the roundhouse that same night at 9:30 p. m. It was then in a leaky condition, and the engineer sent a telegram to De Quincy, La., for a boilermaker to be sent by the night train to repair it; and, for that purpose, its fire was put out. This workman came, and began work at 3 a. m.; and he completed his job. I-Iow long he was at it, the record does not show. The work consisted, as we understand, in simply expanding the flues by means of an instrument inserted in them. It may be well to mention here that a leaky condition of the flues of a locomotive boiler is a common thing, and is no indication whatever of any defectiveness in the crown plate or its attendant parts. When the engine came in, it had 160 to 180 pounds of steam and an ample supply of water. By 12 o’clock the water had fallen so low from leakage and evaporation as to necessitate refilling; and plaintiff’s husband refilled the boiler.
Defendant’s learned counsel argue that, if in the 2y2 hours between 9:30 and 12 the boiler so emptied itself as to need refilling, it must have again emptied itself in the three hours between 12 and 3, when the work of stopping the leaks in the flues began.
We find no great force in this argument. By 12 o’clock the boiler had to a considerable extent cooled down. The steam pressure had greatly diminished, and the supply of cold water had the effect of accelerating this diminishing process. As the heat subsided, the evaporation decreased, and, as the pressure slackened, the leakage lessened. To what extent the pressure had fallen by 12 o’clock is not shown; but some ten minutes before the explosion it was observed to be at 20 pounds.
This is testified to by Green Robertson, the man who lit the fire, and by F. J. Schneider, another employe of the defendant company. Robertson says that he then operated the gauges to ascertain what quantity *136 of water w,as in the boiler, and found that the lower one emitted water, and the middle one wet steam, showing that there was a sufficiency of water over the crown sheet. Schneider testifies that he saw Robertson make this test, and noticed that the result was as here stated. Both of these witnesses testify that they examined the water glass, and that it, too, indicated a sufficiency of water.
Of course, if these two witnesses were to be believed, there would be an end of defendant’s case. But Robertson had a certain interest in thus testifying, in order to discúlpate himself from negligence in starting the fire without there being sufficient water in the boiler; and Schneider is a nephew of plaintiff, and, while he now testifies that he did not operate ,the gauges but only saw Robertson do it, he admits, on cross-examination, that about five hours after the accident he stated, in tb,e presence of witnesses, that he himself made the tests.
The fact that the jury believed these witnesses, as it must have done in order to decide as it did in favor of plaintiff, alone gives rise to any difficulty in the ease, as otherwise the evidence adduced by defendant is so overwhelming, that there would not be one moment’s hesitation in accepting it as conclusive.
Defendant has shown that a piece of steel, such as this crown plate, if superheated without water upon it, acquires a blue color, but does .not otherwise acquire this color; and that this crown plate had this color. Plaintiff’s own expert, Marcotte, testifies to the same thing, but says that the plate did not have this blue color, but was gray as if it had had water upon it.
As to this plate having exhibited this distinctive blue color after the accident, there can be no serious question, as Marcotte stands alone against a large number of witnesses. As to this color being a sure and unmistakable sign, there can be no serious question in the light of the testimony. Some ten witnesses, whose life work has qualified them to speak knowingly on this point, have testified in the most positive and unqualified manner that they know and are positive and cannot be mistaken that only by having been superheated without water upon it this crown sheet could have had this blue color imparted to it. It is impossible to read 'the record without becoming convinced of the perfect sincerity and entire reliability of this testimony; and it is destructive of plaintiff’s theory of this crown plate having collapsed from the defective condition of the bolts and not as the result of not having had water upon it.
The plate itself was in perfect condition, so much so that it was not changed when the locomotive was repaired. What happened was that the downward pressure upon it caused it to wrench off the heads, or threads, of the stay bolts by which it was attached to the top of the boiler, and to drop some four or five inches. Plaintiff contends that these stay bolts were rust eaten and fire worn. The evidence on this point is clearly with defendant. This boiler is shown to have been regularly inspected, and these bolts tested. This had been done a few days before the accident. And, indeed, it is hardly probable that these bolts, which had up to a few hours before withstood a pressure of 160 to 180 pounds, would have yielded under a pressure of 20 pounds or so.
The judgment appealed from is set aside, and the suit dismissed at plaintiff’s cost.